# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| **MITCHELL LANE WYATT** | **CASE NO. 3:19-CV-0808** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **ANDREW SAUL, COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

Mitchell Wyatt protectively filed the instant application for Title II disability insurance benefits on May 13, 2015.  (Tr. 17, 296-304).   He alleged disability as of June 15, 2013, because of polycystic kidney disease; seizures; anxiety; hypertension; acute, but ill-defined cerebrovascular disease; obstructive sleep apnea; fatigue; hypercholesteremia; cerebral vascular accident; and convulsions.  (Tr. 354, 389).   The state agency denied the claim at the initial stage of the administrative process.  (Tr. 154-176).   Thereafter, Wyatt requested and received a December 15, 2017, hearing before an Administrative Law Judge ("ALJ").   (Tr. 117-153). However, in a June 14, 2018, written decision, the ALJ determined that Wyatt was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to other work that exists in significant numbers in the national economy.  (Tr. 14-25).   Wyatt appealed the adverse decision to the Appeals Council.   On May

2, 2019, however, the Appeals Council denied Wyatt's request for review;[1] thus the ALJ's decision became the final decision of the Commissioner.   (Tr. 1-4).

On June 25, 2019, Wyatt sought review before this court.   He asserts several assignments of error that contest different facets of the ALJ's residual functional capacity assessment.   Following the submission of briefs, the matter is ripe.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.   *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).   Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.   *Richardson v. Perales*, 402 U.S. 389, 390 (1971).   The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards.   *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).   Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.   *Richardson v. Perales*, 402 U.S. at 401.   Substantial evidence lies somewhere between a scintilla and a preponderance.   *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).   A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).   The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

---

[1] In so doing, the Appeals Council set aside an earlier decision dated April 18, 2019.   *Id.*, Tr. 8-10.

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.   *See* 42 U.S.C. § 423(a)(1)(D).   The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."   42 U.S.C. § 423(d)(1)(A).   Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.   *See* 42 U.S.C. § 423(d)(2)(A).   Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.   *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.   *See* 20 C.F.R. §§ 404.1520, 416.920.   The steps are as follows,

   (1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

   (2)   An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

   (3)    An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

   (4)   If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

   (5)   If an individual is unable to perform past relevant work, then other factors

> including age, education, past work experience, and residual functional
> capacity must be considered to determine whether the individual can make
> an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5ᵗʰ Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).   When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.   *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.   *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### <u>ALJ's Findings</u>

**I.      Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity since the alleged disability onset date.   (Tr. 19).   At step two, she found that the claimant suffers from severe impairments of seizure disorder, polycystic kidney disorder, hypertension, hypercholesterolemia, and cerebrovascular disease. (Tr. 20-21).[2]   She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 21).

**II.      Residual Functional Capacity**

The ALJ next determined that the claimant retained the residual functional capacity

---

[2] She further found that the claimant's medically determinable impairments of minimal thoracic spondylosis, obstructive sleep apnea, adjustment disorder with depressive and anxiety features, mild cognitive deficits, and linguistic difficulties were non-severe.   *Id*.

("RFC") to perform sedentary work,[3] except that he was limited to no more than occasional climbing of ramps/stairs and never climbing ladders, ropes, or scaffolds.   (Tr. 21-24).   He also was limited to occasional balancing, stooping, kneeling, crouching and crawling.   *Id*.   Finally, he needed to avoid workplace hazards such as dangerous moving machinery, unprotected heights, and anything that required driving.   *Id*.

## III.    Steps Four and Five

At step four, the ALJ determined that the claimant was unable to perform any past relevant work.   (Tr. 24).   Accordingly, she proceeded to step five.   At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education, and the ability to communicate in English.   *Id*.   Transferability of skills was not an issue.   *Id*.

The ALJ then observed that given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.   20 C.F.R. § 404.1569; Rule 201.28, Table 1, Appendix 2, Subpart P, Regulations No. 4; Tr. 24-25.   However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for sedentary work. *Id*.   In response, the VE identified the representative jobs of callout operator, *Dictionary of Occupational Titles* ("DOT") Code # 237.367-014; surveillance system monitor, DOT # 379.367-010; and order clerk, DOT # 209.567-014, that were consistent with the ALJ's RFC and

---

[3] Sedentary work entails:
. . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.   Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. 404.1567(a).

the claimant's vocational profile.   (Tr. 25, 148-149).[4]

## Non-Exhaustive Chronology of Relevant Medical Evidence[5]

Wyatt saw Stuart Melton, M.D., for his regular checkup on July 25, 2013.   (Tr. 508-512).   He was doing well, without any complaints.   *Id.*   Melton diagnosed hypertension, dyslipidemia, and depression.   *Id.*

Wyatt returned to Dr. Melton on November 13, 2013.   (Tr. 500-504).   He was supposed to return in July for follow-up lab work, but never did.   *Id.*   Wyatt's mother disclosed that he had had kidney issues and cysts on his kidneys since he was 14 years old.   *Id.*   Wyatt denied back pain, joint pain, joint swelling, arthritis, and sciatica.   *Id.*   Melton diagnosed fatigue, chronic kidney disease, stage III (moderate), hypertension, and depression.   *Id.*

Wyatt returned to Dr. Melton on November 18, 2013, to discuss his lab results.   (Tr. 520-525).   Wyatt's mother wanted her son to be followed by a cardiologist.   *Id.*   He complained of right flank pain that had started on Saturday.   *Id.*   Wyatt explained that he was not a talker and that was why he had not disclosed his longstanding history of polycystic kidneys.   *Id.*   Wyatt denied back pain, joint pain, joint swelling, arthritis, and sciatica.   *Id.*

A November 18, 2013, x-ray of the abdomen showed no acute process.   (Tr. 516). A November 19, 2013, CT scan of the abdomen showed autosomal dominant polycystic disease, with massive enlargement of both kidneys.   (Tr. 526).   There were several hyperdense masses

---

[4] The VE responded that for the callout operator, surveillance system operator, and order clerk jobs, there were 37,000, 135,000, and 176,000 positions, respectively, available nationally.   (Tr. 148-149).   This incidence of work constitutes a significant number of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

[5] The following recital of evidence includes the additional medical records that plaintiff submitted to the Appeals Council.   The new evidence relates to the period on or before the date of the hearing decision.

on the right that probably were complicated cysts containing hemorrhage or proteinaceous material. *Id.* There also were multiple hepatic cysts commonly seen with this condition. *Id.*

Plaintiff saw urologist, Robert Humble, M.D., on November 21, 2013, for complaints of fatigue. (Tr. 528-532). He also complained of muscle cramps, but denied joint, neck, or back pain. *Id.* He also denied dizzy spells. *Id.*

Plaintiff met with a nutritionist on December 2, 2013. (Tr. 533-534). At that time, he weighed 264 pounds, and was eating out five to seven times per week. *Id.* A typical lunch consisted of Captain D's fried fish, fries, and coke, or a Wendy's or Sonic cheeseburger, fries, and coke. *Id.* For dinner, he ate spaghetti, salad, pizza, hamburgers, steak, or tacos. *Id.* He also enjoyed Little Debbie snacks. *Id.* In short, he ate fried food and fast food daily. *Id.* The nutritionist instructed him, *inter alia*, to limit his caloric intake to 2200. *Id.*

On December 3, 2013, plaintiff saw Michael Nammour, M.D. for his chronic kidney disease, stage 3 moderate. (Tr. 433-436). Nammour diagnosed hypertension and polycystic kidney disease. *Id.* Wyatt had no dizziness or fainting. *Id.*

On December 4, 2013, Wyatt saw Dr. Ronald Koepke, M.D., for evaluation of hypertension that he had experienced since he was 14. (Tr. 568-574). Wyatt reported a sharp chest pain that was a five on a ten-point scale, and that lasted all day long. *Id.* The pain was relieved by stretching. *Id.* He was fatigued. *Id.*

On December 13, 2013, Wyatt returned to Dr. Melton for one-month follow-up. (Tr. 563-567). Wyatt felt good at that time. *Id.* His heart examination was normal. *Id.* He could consider taking Pravastatin 80 mg in the evenings. *Id.* Melton advised Wyatt to try and increase home exercise and maintain good dietary habits. *Id.* If he ever did any heavy, physical activity that caused chest discomfort, he should call the office. *Id.*

Plaintiff returned to Dr. Humble on December 19, 2013.  (Tr. 559-562).  His condition had much improved.  *Id.*  Wyatt was feeling better than he had in some time.  *Id.*  He no longer had any pain in his right flank.  *Id.*

On February 16, 2014, Wyatt was taken to the emergency room and hospitalized following a seizure while at church.  (Tr. 701-719).  He had lost consciousness, was shaking, and had nausea and vomiting.  *Id.*  A brain MRI showed a right-sided lesion in the insular area. *Id.*  He did not have any further seizure activity during his hospital stay.  *Id.*

Plaintiff saw Dr. Melton on February 27, 2014, for follow-up after his seizure.  (Tr. 553-558).  He felt well that day, but complained of fatigue.  *Id.*

On March 4, 2014, plaintiff returned to Dr. Nammour.  (Tr. 437-439).  His symptoms were controlled on medication.  *Id.*

On March 11, 2014, plaintiff was seen by David Caskey, M.D.  (Tr. 540-544).  Plaintiff had had a CVA a few weeks ago, plus a seizure while at church.  *Id.*  He received a workup at the hospital and was told that he previously had suffered a stroke.  *Id.*  Since the seizure, he was having fatigue and difficulty with speech.  *Id.*  He admitted that he tired easily and was ready to lie down by lunchtime.  *Id.*  Wyatt was employed as a writer.  (Tr. 541).  Caskey remarked that Wyatt needed to watch his calorie intake and to get himself lean.  *Id.*  Wyatt was scheduled for an echo and stress test.  *Id.*

A March 27, 2014, stress test was normal -- normal left ventricle, normal ejection fraction and good exercise capacity with no angina.  (Tr. 576-577).  Similarly, a March 27, 2014, echocardiography report was by and large normal.  (Tr. 578).

In an April 6, 2014, letter to Dr. Melton, Dr. Koepke opined that there was no evidence of significant obstructive coronary artery disease.  (Tr. 582).

8

On May 13, 2014, Wyatt saw Michael Ellerbe, M.D., for complaints of his legs needing to move at bedtime, plus loud snoring.   (Tr. 583-586).   He denied back pain, joint pain, joint swelling, arthritis, and sciatica.   *Id.*   He weighed 278 pounds.   *Id.*   Ellerbe diagnosed restless leg syndrome and snoring.   *Id.*

On May 29, 2014, plaintiff saw Lowery Thompson, M.D., for his right frontal stroke by history and simultaneous GTC seizure.   (Tr. 113-116).   Wyatt experienced some cognitive impairment that interfered with his schoolwork and his work as a writer.   *Id.*   Review of systems indicated that he was positive for back pain, gait problems, and leg swelling, but negative for joint swelling and arthralgias.   *Id.*   He was positive for behavioral problems, confusion, sleep disturbance, decreased concentration and agitation.   *Id.*   Nonetheless, his motor exam showed 5/5 strength in all muscle groups, with a normal gait.   *Id.*   He also exhibited a normal range of motion in all joints, with no tenderness.   *Id.*   His speech was delayed, and he was aggressive.   *Id.*   Cognition and memory were not impaired.   *Id.*   He exhibited a depressed mood.   *Id.*   Wyatt had mild cognitive delay and irritability.   *Id.*   Thompson instructed Wyatt to stop smoking and to get on a 2000 calorie diabetic diet.   *Id.*

Plaintiff returned to Dr. Nammour for six-month follow-up on September 10, 2014.   (Tr. 440-443).   He complained of right flank pain.   *Id.*   Nammour diagnosed hypertension and polycystic kidney.   *Id.*

On September 16, 2014, plaintiff returned to Dr. Humble.   (Tr. 601-604).   He reported that he had recently passed a right ureteral stone.   *Id.*   However, Wyatt denied back pain, sciatica, muscle tightness, anxiety, and depression.   *Id.*

On October 30, 2014, Wyatt returned to Dr. Ellerbe for a wellness visit, hypertension, and pain.   (Tr. 596-600).   He complained of back pain beneath the shoulder blade from an old

snow sled accident a few years earlier. *Id.* He also reported right hand numbness that had worsened over the last few months. *Id.* Ellerbe diagnosed back and neck pain, plus righthand numbness. *Id.*

Wyatt returned to Dr. Thompson on October 31, 2014, for follow-up for a right frontal stroke by history and simultaneous GTC seizure. *Id.* He had had no recent seizures -- only the one seizure in February 2014. *Id.* Review of systems indicated that Wyatt was positive for back pain, gait problems, and leg swelling, but negative for joint swelling and arthralgias. *Id.* He also was positive for behavioral problems, confusion, sleep disturbance, decreased concentration and agitation. *Id.* Nevertheless, his motor exam showed 5/5 strength in all muscle groups, with a normal gait. *Id.* He also exhibited a normal range of motion in all joints, with no tenderness. *Id.* His speech was delayed, and he was aggressive, with a depressed mood. *Id.* Cognition and memory were not impaired. *Id.* He had mild cognitive delay and irritability. *Id.* Thompson diagnosed convulsions, obstructive sleep apnea, sinusitis, depressive disorder, tobacco use, hyperlipidemia, essential hypertension, and cerebral artery occlusion with cerebral infarction. *Id.*

Plaintiff returned to Dr. Nammour on December 10, 2014, for three-month follow-up for his cystic kidney disease. (Tr. 445-448). He had had no dizziness or fainting. *Id.* He weighed 268 pounds. *Id.* Nammour diagnosed essential hypertension; chronic kidney disease, stage three which was worsening; and polycystic kidney. *Id.*

On December 19, 2014, Wyatt saw Dr. Humble with complaints of urgency, urge incontinence, and bilateral flank pain. (Tr. 615-620). However, he denied anxiety and depression. *Id.* Humble diagnosed bilateral prostatic hyperplasia, urge incontinence, and hypertonicity of bladder. *Id.* Wyatt was to return in one year. *Id.*

Plaintiff next returned to Dr. Nammour on January 7, 2015, for one-month follow-up for his polycystic kidney disease.  (Tr. 449-452).  He had no dizziness or fainting.  *Id.*  He weighed 282 pounds.  *Id.*  Nammour diagnosed Wyatt with essential hypertension, which was inadequately controlled, and chronic kidney disease, stage three.  *Id.*  Plaintiff stated that the cysts *sometimes* hurt him.  *Id.*

On January 9, 2015, plaintiff returned to Dr. Lowery Thompson for follow-up.  (Tr. 101-105, 632-640).  Dr. Thompson noted that plaintiff had suffered a right, frontal stroke by history and simultaneous GTC seizure.  *Id.*  Review of systems indicated that he was positive for back pain, gait problems, and leg swellings, but negative for joint swelling and arthralgias.  *Id.*  He was positive for behavioral problems, confusion, sleep disturbance, decreased concentration and agitation.  *Id.*  His motor exam showed 5/5 strength in all muscle groups, with a normal gait. *Id.*  Wyatt exhibited a normal range of motion in all joints, with no tenderness.  *Id.*  His speech was delayed, and he was aggressive.  *Id.*  Cognition and memory were not impaired. *Id.*  Wyatt exhibited a depressed mood, with mild cognitive delay and irritability.  *Id.* Thompson diagnosed convulsions, obstructive sleep apnea, and cerebrovascular accident.  *Id.*

Plaintiff returned to Dr. Nammour on January 14, 2015, complaining that he had swelling of his hands and feet after he started Procardia.  (Tr. 454-457).  Dr. Nammour, however, did not detect any swelling in the extremities, and the examination was normal.  *Id.*

Plaintiff next saw Dr. Nammour on April 22, 2015, for three-month follow-up.  (Tr. 458-461).  His symptoms were controlled on his current medication.  *Id.*

Plaintiff returned to Dr. Ellerbee on May 12, 2015.  (Tr. 610-614).  He reported that he had been passing out after eating sweets.  *Id.*  He also complained of edema and shortness of breath.  *Id.*  He weighed 287 pounds.  *Id.*  Plaintiff stated that he was there to discuss his

11

"paperwork." *Id.* Over the past two weeks, he had not felt depressed at all. *Id.* Ellerbee diagnosed hypertension, seizure disorder, polycystic kidney disease, and chronic kidney disease stage III (moderate). *Id.* Ellerbee advised Wyatt to consume more small regular meals.

On May 15, 2015, plaintiff returned to Dr. Thompson. (Tr. 95-100, 624-630). Thompson noted that Wyatt had dominant polycystic kidney disease, stage III/IV, and that he eventually would require a renal transplant. *Id.* Review of systems indicated that Wyatt was positive for back pain, gait problems, and leg swellings, but negative for joint swelling and arthralgias. *Id.* He also was positive for behavioral problems, confusion, sleep disturbance, decreased concentration and agitation. *Id.* His motor exam showed 5/5 strength in all muscle groups, with a normal gait. *Id.* Wyatt also exhibited a normal range of motion in all joints, with no tenderness. *Id.* His speech was delayed, and he was aggressive, with a depressed mood. *Id.* Cognition and memory were not impaired. *Id.* Thompson diagnosed convulsions, obstructive sleep apnea, acute cerebrovascular disease, and rhinosinusitis. *Id.*

On July 2, 2015, plaintiff saw kidney specialist, Richard O'Donovan, M.D. (Tr. 659-661). Wyatt had no real complaints that day. *Id.* He was going to be a senior in college. *Id.* He was studying English and planned to do social work. *Id.* O'Donovan opined that plaintiff had some moderate reduction in kidney function. *Id.* He also advised Wyatt to lose weight, and to check his blood pressure. *Id.* His seizure disorder was well-controlled. *Id.* Kidney failure was a possibility, but hopefully, some way off at that time. *Id.*

At the request of the stage agency, Wyatt underwent a speech/language evaluation with Carolyn Fleming, M.A., on October 13, 2015. (Tr. 721-723). Wyatt's long-term memory, orientation, and awareness were considered adequate. *Id.* He could establish and maintain simple topics of conversation. *Id.* He also was able to follow two to three step instructions.

12

*Id.*  Wyatt's linguistic difficulties were mild overall, and his speech was 100% intelligible.  *Id.*

He did not exhibit a fluency disorder.  *Id.*  Wyatt also had mild deficits in terms of immediate

and short-term memory.  *Id.*

At the request of the state agency, plaintiff underwent a consultative mental status

examination with John Teal, Ph.D., on November 9, 2015.  (Tr. 726-728).  Wyatt's chief

complaints were depression, anxiety, seizures, kidney disease, and history of stroke.  *Id.*  He

reported that at some point within the past three years he had been very depressed and went to

the St. Francis Mental Health Unit, where they held him for 72 hours.  *Id.*  Wyatt appeared to

be mildly obese.  *Id.*  He had stopped working because he could not continue to manage work,

school, *and* being sick.  *Id.*  He reported that he smoked one to two cigarettes per day.  *Id.*  He

had lost about 30 pounds within the past three years.  *Id.*  Wyatt endorsed a dysphoric and

irritable mood.  *Id.*  He was able to follow complex instructions and understand complex

questions.  *Id.*  Immediate memory appeared to be marginally adequate, whereas his delayed

and recent memory were adequate.  *Id.*  Overall sustained concentration was fair.  *Id.*  His

ability to stay on task appeared to be adequate.  *Id.*  Overall immediate concentration was

marginally adequate.  *Id.*  He demonstrated fair persistence.  *Id.*  Overall social interaction

and adaptation appeared to be fair.  *Id.*

Teal diagnosed adjustment disorder, with depressive and anxiety features.  *Id.*  Wyatt

presented with mild depressive and anxiety symptoms.  *Id.*  He could recall simple instructions

in a work environment.  *Id.*  He also could carry-out simple instructions without redirection.

*Id.*  His sustained concentration was fair.  *Id.*  He likely would not have difficulty responding

to changes in a work setting.  *Id.*  His prognosis related to mental capacities was fair.  *Id.*

On November 13, 2015, plaintiff saw nurse practitioner Amy Pruden.  (Tr. 864-868).

13

Plaintiff weighed 265 pounds at that time.   *Id.*   He was in no pain and had no complaints.   *Id.*
He reported that he was homeschooling his children.   *Id.*   Wyatt also stated that he was going to
go on the transplant list in January.   *Id.*   He disclosed that his occupation was a writer.   *Id.*   He
denied any back pain, joint pain, etc.   *Id.*

On December 21, 2015, plaintiff returned to Dr. Humble, who diagnosed him with adult
polycystic kidney disease, BPH, and hypertonic bladder.   (Tr. 882-885).

On January 8, 2016, plaintiff returned to Dr. Thompson for follow-up for seizures and
sleep apnea.   (Tr. 89-94, 816-821).   Wyatt reported that he experienced "stare off seizures" at
least once per week.   *Id.*   His most recent episode had lasted less than 30 seconds.   *Id.*
Associated symptoms included sleepiness and headaches.   *Id.*   He had no cough, nausea,
vomiting, diarrhea, or bowel incontinence.   *Id.*   The episode was witnessed.   *Id.*   He had
constant breathing problems that had been gradually improving.   *Id.*   However, he had no
dyspnea upon exertion.   *Id.*   His symptoms were aggravated by lying down.   *Id.*   Wyatt
reported moderate improvement with CPAP treatment.   *Id.*   He had no definite seizures.   *Id.*
Wyatt would stare-off, but only when he was not actively engaged.   *Id.*   He also was a past
regular marijuana user.   *Id.*   Review of systems was negative for musculoskeletal symptoms.
*Id.*   He was positive for excessive daytime sleepiness, seizures, and vertigo.   *Id.*   He was
nervous and anxious, but negative for difficulty with concentration and loss of balance.   *Id*.
Wyatt also was nervous/anxious, but negative for depression and memory loss.   *Id.*   His motor
exam showed 5/5 strength in all muscle groups, with a normal gait.   *Id.*   Wyatt also exhibited a
normal range of motion in all joints, with no tenderness.   *Id.*   His speech was delayed, and he
was aggressive, with a depressed mood.   *Id.*   Cognition and memory were not impaired.   *Id.*

Plaintiff returned to Dr. O'Donovan on February 17, 2016.   (Tr. 49-52).   Wyatt's

14

primary problem at that time was depression, with difficulty getting out of bed, lack of appetite, lack of interest, and lack of energy.  *Id.*  He had not really completed his general studies course because he found the math and science courses to be too difficult.  *Id.*  Accordingly, he had decided to home-school his three children, ages 13, 11, and 7 years old, instead.  *Id.*  Wyatt reported taking a small amount of exercise each day.  *Id.*  He also had experienced a few seizures.  *Id.*  On examination, his general condition was good, with a somewhat depressed affect.  *Id.*  His seizure problem was managed by Dr. Thompson.  *Id.*  O'Donovan's overall impression was that Wyatt had some depression.  *Id.*  He opined, however, that plaintiff needed to engage in some activity and perhaps take the two classes that he needed individually so he could get his degree under his belt and improve his outlook.  *Id.*

Plaintiff called his nurse practitioner about his disability paperwork on July 5, 2016.  (Tr. 910-911).  Amy Pruden advised him, however, that although they did not do disability paperwork there, they would be happy to write a letter for him.  *Id.*  If he needed any changes to the letter, he could let them know after reading it.  *Id.*  That same day, Pruden dutifully wrote a to whom it may concern letter in which she stated that Wyatt was seen at their office for his primary health care, as well as by urologist and nephrologist.  *Id.*  She stated that Wyatt was unable to work because of his chronic health issues that were progressing.  *Id.*  She added that Wyatt was going on a transplant list in the near future.  *Id.*

On September 14, 2016, plaintiff returned to his kidney specialist, Dr. O'Donovan, for follow-up for polycystic kidney disease.  (Tr. 45-48).  Wyatt reported that he was feeling well.  *Id.*  He was more active and was home-schooling a child.  *Id.*  He had found more activities for himself.  *Id.*  His appetite was good.  *Id.*  Wyatt was very anxious about what to do about his kidneys, but was not in any pain from his enlarged kidneys.  *Id.*  O'Donovan remarked that

clearly, Wyatt's kidney function still was *very good and far* from requiring renal replacement therapy.   *Id.*   He consumed a lot of sugar drinks, which he ought not do with a BMI of 36.   *Id.*

Wyatt saw Dr. Thompson on September 12, 2016, for follow-up for seizures and sleep apnea.   (Tr. 83-88, 822-827).   Wyatt reported that he experienced "stare off seizures" at least once per week.   *Id.*   His most recent episode had lasted less than 30 seconds.   *Id.*   Associated symptoms included sleepiness and headaches.   *Id.*   He had no cough, nausea, vomiting, diarrhea, or bowel incontinence.   *Id.*   The episode was witnessed.   *Id.*   He also had constant breathing problems that had been gradually improving.   *Id.*   However, he had no dyspnea upon exertion.   *Id.*   His symptoms were aggravated by lying down.   *Id.*   He reported moderate improvement with CPAP treatment.   *Id.*   He also had had no definite seizures.   *Id.*   He will stare-off, but only when he is not actively engaged.   *Id.*   He was a regular marijuana user in the past.   *Id.*   He also used alcohol.   *Id.*   Wyatt reported back pain, difficulty with concentration, excessive daytime sleepiness, dizziness, light-headedness, loss of balance, and seizures.   *Id.*   He was positive for depression.   *Id.*   His motor exam showed 5/5 strength in all muscle groups, with a normal gait.   *Id.*   Wyatt also exhibited a normal range of motion in all joints, with no tenderness.   *Id.*   His speech was delayed, and he was aggressive, with a depressed mood.   *Id.*   Cognition and memory were not impaired.   *Id.*   Thompson diagnosed obstructive sleep apnea and convulsions.   *Id.*

Plaintiff saw Amy Pruden on November 28, 2016.   (Tr. 926-930).   He was not in any pain.   *Id.*   He had felt down or depressed nearly every day within the past two weeks.   *Id.*

Wyatt saw Billy Branch, M.D., on February 24, 2017, with complaints of back pain and ADPCKD (autosomal dominant polycystic kidney disease).   (841-844).   His symptoms were aggravated by lying down.   *Id.*   A February 24, 2017, x-ray of the thoracic spine showed

16

minimal thoracic spondylosis.   (Tr. 976).

On March 17, 2017, Wyatt returned to Dr. Thompson for six-month follow-up for sleep apnea and seizures.   (Tr. 77-82). His last seizure had been on January 25, 2017.   *Id.*   Wyatt reported that he experienced "stare off seizures" at least once per week.   *Id.*   His most recent episode lasted less than 30 seconds.   *Id.*   His associated symptoms included sleepiness and headaches.   *Id.*   He had no cough, nausea, vomiting, diarrhea, or bowel incontinence.   *Id.*   The episode was witnessed.   *Id.*   He had constant breathing problems that had been gradually improving.   *Id.*   However, he had no dyspnea upon exertion.   *Id.*   His symptoms were aggravated by lying down.   *Id.*   He reported moderate improvement with CPAP treatment.   *Id.* He had no definite seizures.   *Id.*   He will stare off, but only when he is not actively engaged. *Id.*   His seizure on January 25, 2017 was the first one in over two years.   *Id.*   He used marijuana regularly in the past.   *Id.*   He reported back pain, joint pain, muscle cramps, weakness, and neck pain.   *Id.*   His motor exam showed 5/5 strength in all muscle groups.   *Id.* Wyatt also exhibited a normal range of motion in all joints, with no tenderness.   *Id.*   His speech was delayed, and he was aggressive, with a depressed mood.   *Id.*   Cognition and memory were not impaired.   *Id.*   Thompson diagnosed obstructive sleep apnea, convulsions, rhinosinusitis, polycystic kidney disease, and acute, but ill-defined cerebrovascular disease.   *Id.*

On March 24, 2017, plaintiff returned to Dr. Branch.   (Tr. 837-839).   Wyatt reported back pain that was between his shoulder blades and flanks.   *Id.*   He described his pain as moderate to severe.   *Id.*   He also complained of a hernia.   *Id.*   Branch diagnosed thoracic spine pain, seborrheic keratosis, and ventral hernia.   *Id.*

On March 28, 2017, plaintiff saw his kidney specialist, Dr. O'Donovan, for follow-up for polycystic kidney disease.   (Tr. 42-44).   Wyatt reported that he felt well, his appetite was good,

and his weight was steady.   *Id.*   He had suffered another seizure, so Dr. Thompson had increased his Keppra to750.   *Id.*   Wyatt had no real complaints.   *Id.*

Wyatt returned to Dr. Branch on August 2, 2017.   (Tr. 833-835).   Branch noted that Wyatt's symptoms from his polycystic disease included decreased renal function, thoracic back pain, abdominal distension, and lethargy.   *Id.*   He also indicated that Wyatt had poorly controlled hypertension, but with no associated symptoms.   *Id.*   His thoracic pain was a dull ache.   *Id.*   Wyatt also had insomnia.   *Id.*   His wife reported that he kept a terrible sleep schedule and did not wake up until 5:00 p.m. sometimes.   *Id.*   This practice made his family unhappy because he did not interact with them.   *Id.*   His wife added that if Wyatt did any physical exertion, then he slept for 16-20 hours.   *Id.*   Wyatt had a normal memory, with depressed mood.   *Id.*   Branch assessed polycystic disease, hypertension, chronic thoracic back pain, insomnia, and depression.   *Id.*   He indicated that Wyatt needed to establish better sleep hygiene/routine.   *Id.*   He also recommended cardiovascular exercise.   *Id.*

On September 21, 2017, plaintiff returned to Dr. O'Donovan for follow-up for polycystic kidney disease.   (Tr. 38-41).   Wyatt reported that he felt well, his appetite was good, and his weight was steady.   *Id.*   He had no real complaints.   *Id.*   O'Donovan assessed hypertension, well-controlled; hyperlipidemia, on status, thus, met therapy; seizure disorder, well-controlled; secondary hyperparalellthyroidism, Level 23, in range; hypovitaminosis D, in range; and mass effect of polycystic kidney disease, stable.   *Id.*   O'Donovan noted that Wyatt would need surgical review at some point, and perhaps at that time, he would be a candidate for elective preemptive kidney transplant.   *Id.*

Wyatt skipped an appointment on October 26, 2017.   (Tr. 954).

18

## Analysis

In her decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, available treatment records, together with the impressions of the consultative psychologist and plaintiff's treating nurse practitioner, plus the assessments of the non-examining agency physician and psychologist.   (Tr. 21-24).   In deriving plaintiff's RFC, the ALJ resolved the opinion evidence by assigning "little" weight to the impressions of plaintiff's treating nurse practitioner, Amy Pruden, and the non-examining agency physician, James Williams, M.D.   *Id.*   However, for purposes of plaintiff's mental RFC, the ALJ assigned "great" weight to the opinions of the consultative examiner, Dr. Teal, and the non-examining agency psychologist, Charlotte Ducote, Ph.D.   *Id.*

Plaintiff argues initially that the ALJ erred by failing to adopt any limitations of functioning stemming from his non-severe mental impairment(s).   In this case, the ALJ determined that plaintiff's mental impairment(s) was non-severe.   In assessing the severity of an impairment, the Fifth Circuit has determined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."   *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)).

However, when, as here, the ALJ's analysis proceeds beyond step two of the sequential evaluation process, strict adherence to *Stone* and its requirements is not required.   *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Bowen*, 829 F.2d 524, n. 1 (5th Cir. 1987).   Rather, under these circumstances, the effect of the ALJ's step two determination is measured by whether her step three finding and RFC are supported by substantial evidence.   This is so because once at least one severe

19

impairment is determined to exist, all medically determinable impairments must be considered in the remaining steps of the sequential analysis.  *See* 20 C.F.R. §§ 404.1545, 416.945.

In her decision, the ALJ acknowledged her obligation to consider all of plaintiff's impairments as part of her RFC assessment, including those impairments that were non-severe. (Tr. 19).   In fact, the ALJ discussed plaintiff's alleged cognitive impairment as well as Dr. Teal's findings during her RFC discussion.   (Tr. 22-23).   However, the ALJ characterized Dr. Teal's finding as indicative of but mild impairment to memory and concentration, which was consistent with the agency psychologist's interpretation of Teal's examination.   *Id.*

Plaintiff essentially contests how the ALJ and the agency psychologist interpreted Dr. Teal's examination findings.   Plaintiff argues that, at minimum, the ALJ should have considered the need for an RFC that included a limitation to simple instructions and work routines to accommodate the effects of plaintiff's mental impairments.   (Pl. Brief, pg. 14).   However, while Dr. Teal stated that Wyatt could recall simple instructions in a work environment, he also observed that he was capable of following complex instructions and understanding complex questions.   (Tr. 727).   Furthermore, Wyatt's overall sustained concentration was fair.   *Id.* Also, Dr. Thompson regularly documented that Wyatt's cognition was no more than mildly impaired.   *See* discussion, *supra.*[6]

In short, there is substantial evidence to support the ALJ's finding that plaintiff's mental

---

[6] Somewhat paradoxically, plaintiff also seemed to take issue with the sufficiency of Dr. Teal's one-time consultative examination because mental impairments often wax and wane in severity. Again, however, Dr. Thompson's consistent impressions of plaintiff's mental impairment over time undercut plaintiff's argument.   Furthermore, insofar as plaintiff contends that the ALJ failed to determine whether the claimant could *maintain* a job, the court observes that remand for a determination of whether a claimant can maintain employment is not required where, as here, the claimant did not:   1) assert that his condition only periodically precluded him from working, and 2) offer medical evidence that his condition would intermittently prevent him from maintaining employment or functioning in the employment context.   *Wise v. Barnhart*, 101 Fed. Appx. 950 (5th Cir. 2004).

impairments did not result in any material limitations of functioning.    Nevertheless, even if, as plaintiff contends, the ALJ should have adopted a limitation that restricted him to simple instructions and work routines, any error was harmless.[7]    The ALJ's hypothetical to the vocational expert included a limitation to simple, routine tasks involving no more than simple short instructions and simple work-related decisions with few workplace changes.    (Tr. 148-149).[8]    Nonetheless, the vocational expert opined that plaintiff still could perform the representative jobs.    *Id*.

Wyatt argues next that the ALJ's decision to effectively reject the opinion of the non-examining agency physician undermined any cognizable basis for her RFC because the remaining record did not include an opinion from a medical source to support the ALJ's physical RFC for a reduced range of sedentary work.[9]    Indeed, when no medical provider has issued an opinion or medical source opinion regarding the effects of a claimant's impairments, this omission frequently requires reversal and remand.    *See e.g., Coleman v. Astrue,* No. 09-0759,

---

[7] "Procedural perfection in administrative proceedings is not required."    *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).    Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988); *see also Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).

[8] Courts in this circuit have held that an RFC limited to simple work reasonably incorporates a moderate or even *marked* limitation in concentration, persistence, or pace.    *Reid v. Astrue*, Civil Action No. 10-0237, 2011 WL 4101302 (S.D. Miss. Aug. 15, 2011) *report and recommendation adopted,* 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011); *Madrid v. Colvin*, Civil Action No. 12-800, 2013 WL 6641305 (N.D. Tex. Dec. 17, 2013); *Cornejo v. Colvin*, Civil Action No. 11-470, 2013 WL 2539710 (W.D. Tex. June 7, 2013).

[9] Although plaintiff's nurse practitioner stated in July 2016 that Wyatt was unable to work, it is manifest that a medical provider's statement that a claimant is "disabled" or "unable to work" is not accorded any special significance under the regulations.    *See* 20 C.F.R. § 404.1527(d)(1)-(3); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

2010 WL 3257621 (W.D. La. July 21, 2010).   However, the absence of a medical source statement, "does not, in itself, make the record incomplete."   *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).   In such a situation, the court's inquiry properly "focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record."   *Id*.

The undersigned is persuaded that this case presents one of the limited instances where the record supplies the requisite substantial evidence to support the ALJ's RFC.   First, when asked at the hearing what specifically would prevent him from performing his past relevant work in retail sales, Wyatt replied that it was the standing and bending, but "mostly" his inability to use the restroom because then the floor would remain unattended.   (Tr. 129).   Of course, the ALJ limited Wyatt to work at the sedentary exertional level, with only occasional postural activities.   It is also worth noting that some two years after his alleged disability onset date, and even after his stroke and seizure, plaintiff continued to study English and still planned to do social work.   (Tr. 659-661).

At the hearing, Wyatt admitted that he could lift up to ten pounds.   (Tr. 142).   He also acknowledged that he could stand and/or walk for ten to fifteen minutes at a time before needing to change position.   (Tr. 130-131).   Wyatt also purported to limit his ability to sit to 15 minutes increments.   *Id*.   However, he previously indicated on his disability questionnaire that his impairments did not affect his ability to sit.   *See* Tr. 375.   Similarly, on his appeal form, Wyatt again indicated that it was his ability to stand (rather than an inability to sit), that was restricted by his impairments.   (Tr. 397).

Wyatt's activities of daily living further support the ALJ's RFC.   Despite an alleged disability onset date of June 2013, Wyatt managed to complete two years of college by May 2015.   (Tr. 355).   Rather than endorsing disability, Wyatt's kidney specialist, Dr. O'Donovan,

encouraged Wyatt to finish the classes that he needed to obtain his degree.   (Tr. 49-52).

Furthermore, as recently as September 21, 2017, Wyatt was reporting to Dr. O'Donovan that he

felt well and had no real complaints.   (Tr. 38).

Plaintiff also testified that a typical day entailed him getting the kids off to school, and

then sitting outside with his dog before trying to wash some dishes.   (Tr. 135).   After that, he

will sit on the couch and try to get comfortable for awhile.   *Id*.   If he has any errands to run, he

will try and get them done before his wife returns home from work.   *Id*.   He does laundry while

seated, light housework, mows the law with a riding lawn mower, and even does the dishes.

(Tr. 371-372).   It takes him a couple of hours for laundry, plus an hour on dishes and kitchen

cleanup.   *Id*.   He is able to drive a car, his seizures notwithstanding.   (Tr. 373).   Moreover,

Wyatt goes shopping twice per week for about an hour each time.   *Id*.

Plaintiff contends that the ALJ failed to account for the severity of his multiple

impairments, such as his extremely serious kidney disease.   To support his argument, plaintiff

cited a December 19, 2014, record from his urologist, which noted that he had "near end-stage

adult polycystic kidney with chronic renal insufficiency."   However, plaintiff has had kidney

issues and cysts on his kidneys since he was 14 years old.   (Tr. 500-504).   Moreover, according

to his wife, his kidneys were holding steady at 30 percent functionality.   (Tr. 146).   In

September 2016, Wyatt's kidney specialist, Dr. O'Donovan, noted that he was not in any pain

from his enlarged kidneys and that his kidney function still was very good and *far* from requiring

renal replacement therapy.   (Tr. 45-48).   At Wyatt's most recent visit with his kidney specialist

in September 2017, Dr. O'Donovan noted that Wyatt would need surgical review at some point,

and perhaps when that time came, he would be a candidate for elective preemptive kidney

transplant.   (Tr. 38-41).   In the meantime, Wyatt felt well, and had no real complaints.   *Id*.

23

Plaintiff further argues that the ALJ gave short shrift to his chronic seizures.   However, the ALJ included seizure protocols in her RFC.   Moreover, the medical record appeared to document no more than two grand mal seizures.   As for his ongoing "stare-off" seizures, they last up to 30 seconds, occur approximately five times per week when he is not actively engaged, and after suffering one of these "seizures," his medication enables him to jump back into the conversation easier than before.   *See* Tr. 144.

Citing Social Security Rulings 02-1p and 19-2p, plaintiff further argues that the ALJ failed to consider the effects of his obesity.   However, the ALJ unequivocally stated that she considered all limitations and symptoms in formulating her RFC.   (Tr. 24).   Furthermore, the ALJ reduced plaintiff's RFC to a limited range of sedentary work, which is about as restricted as one can be and still work.   There is no indication that plaintiff's obesity imposed any further limitation.   Moreover, plaintiff endorsed activities of daily living consistent with the RFC, which, needless to say, he was able to do despite his obesity.   *See* discussion, *supra*.   In addition, plaintiff exhibited a rather cavalier attitude towards his condition by continuing to consume a lot of sugary drinks in the face of his significant BMI.   *See* Tr. 45-48.   Certainly, if his obesity was as debilitating as he now professes, it stands to reason that he would have taken more deliberate steps to ensure that his diet did not exacerbate his condition.

Plaintiff further argues that the ALJ failed to consider his subjective complaints.   In her decision, however, the ALJ observed that Wyatt's "statements concerning the intensity, persistence and limited effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."   (Tr. 23). In so holding, she cited a missed appointment(s), the fact that his allegations were inconsistent with his activities of daily living, plus treatment records which indicated that he was doing well

24

at times.

Given the extensive medical record in this case, the court certainly does not attribute any significance to the odd missed appointment.   However, plaintiff's activities of daily living, his disability questionnaires, and his hearing testimony combine to provide substantial, albeit not uniform, support for the ALJ's RFC.   *See* discussion, *supra*.   In other words, the ALJ clearly relied upon plaintiff's own description of the effects of his impairments, at least in part, to support her RFC.   The medical treatment records, again while not uniform, further support the ALJ's RFC.

The ALJ's decision regarding the credibility of plaintiff's complaints is entitled to considerable judicial deference if supported by substantial evidence.   *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).   Here, the ALJ's "credibility" determination satisfied the requirements of 20 C.F.R. § 404.1529, and is supported by substantial evidence.   *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (ALJ gave some weight to claimant's complaints; thus, claimant's arguments that his subjective complaints were not given enough weight proves unavailing); *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

Finally, plaintiff faults the ALJ for not properly evaluating the so-called lay witness testimony provided by his wife.   While an ALJ certainly is obliged to consider all of the record

evidence,[10] she need not discuss every piece of evidence in the record. *Bordelon v. Shalala*, 41 F.3d 661 (5th Cir. 1994). Here, the ALJ acknowledged that she reviewed all of the evidence, including the testimony. (Tr. 23); s*ee Daniels v. Apfel*, 181 F.3d 97 (5th Cir. May 20, 1999) (unpubl.) (ALJ's failure to discuss expert opinion testimony did not constitute error because he stated that he considered the entire record). Furthermore, she specifically noted that Wyatt's wife alleged that he had difficulty finding words and processing thoughts. (Tr. 22). However, objective testing did not support severe cognitive impairment. *Id*. Furthermore, even his wife agreed that his medication was doing a good job controlling his seizures. (Tr. 144). In other words, like much of the other record evidence, plaintiff's wife's testimony presents a mixed bag. Overall, however, her testimony generally was consistent with the ALJ's RFC.

## Conclusion

The evidence in this case was by no means uniform and could have supported a different outcome. Such conflicts in the evidence, however, are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000).[11] That is not to say that the Commissioner's decision is blemish-free, but procedural

---

[10] *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[11] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id*. This exception is applicable here.

perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.   *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error.   Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 14th day of April 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

27